UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

PHILLIP Bell JR.; LORNA BARNES; and ANTHONY BARNES, and ISAHIA SANDOVAL; EDWARD

Plaintiffs,

vs.

SADDLEBACK VALLEY UNIFIED SCHOOL DISTRICT; KLUTCH SPORTS; NEXT LEVEL SPORTS & ACADEMICS; WONG TRICIA OSBORNE; CHAD JOHNSON; STEVE BRISCOE; and DOES in their individual and official capacities, et al.,

Defendants.

Case No. 4:24-cv-05545-JST

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' SADDLEBACK VALLEY UNIFIED SCHOOL DISTRICT, EDWARD WONG, TRICIA OSBORNE, CHAD JOHNSON MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

i.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**1. TABLE OF CONTENTS**

I. INTRODUCTION..........................................................3

II. RELEVANT FACTUAL BACKGROUND...............................3

III. ARGUMENT..............................................................9

A. Standards on a Motion to Dismiss.............................9

IV. ARGUMENT.............................................................10

A. Plaintiffs Have Stated a Claim for the Second Cause of Action Against the District..................................................11

    1. Official Policy or Custom......................................11

    2. Failure to Train...................................................12

    3. Final Policymaker's Decision................................13

    4. Conclusion on Monell Claim..................................14

        B. Plaintiffs Have Stated a Claim for the Eighth Cause of Action (Unjust Enrichment).............................................14

    5. The Benefit Received by Johnson............................14

    6. Allegations Showing Bell III Was Himself the Benefit.....15

    7. Unethical Means of Obtaining the Benefit..................15

    8. Pleading Standard Satisfied..................................16

        C. Plaintiffs Have Stated a Claim for the Tenth Cause of Action..................................................................16

        D. Punitive Damages.................................................17

        E. Leave to Amend....................................................17

        V. CONCLUSION......................................................17

        Respectfully Submitted..............................................17

        Proof of Service (separately paginated)..........................2

## 2. TABLE OF AUTHORITIES

**Cases**

A.B. v. City of Santa Ana..................................................11

Applied Underwriters, Inc. v. Lichtenegger, 913 F.3d 884 (9th Cir. 2019)....................10

Ashcroft v. Iqbal, 556 U.S. 662 (2009)...................................9

Connick v. Thompson, 563 U.S. 51 (2011)............................12

Estate of Osuna v. County of Stanislaus, 392 F. Supp. 3d 1162 (E.D. Cal. 2019)...................11

Hishon v. King & Spalding, 467 U.S. 69 (1984).....................10

Hyde v. City of Willcox, 23 F.4th 863 (9th Cir. 2022).............12

Lopez v. Smith, 203 F.3d 1122 (9th Cir. 2000).....................10

Oviatt v. Pearce, 954 F.2d 1470 (9th Cir. 1992)....................11

Pembaur v. City of Cincinnati, 475 U.S. 469 (1986)..............13

Praprotnik v. City of St. Louis, 485 U.S. 112 (1988)..............13

Scheuer v. Rhodes, 416 U.S. 232 (1974)................................9

Sprewell v. Golden State Warriors, 266 F.3d 979 (9th Cir. 2001)............................10

Starr v. Baca, 652 F.3d 1202 (9th Cir. 2011), reh'g en banc denied, 659 F.3d 850 (9th Cir. 2011)........................9

Walleri v. Federal Home Loan Bank of Seattle, 83 F.3d 1575 (9th Cir. 1996).......................9

Wells v. Bd. of Trustees of California State Univ., 393 F. Supp. 2d 990 (N.D. Cal. 2005)................................17

**Statutes, Rules, and Regulations**

California Government Code § 818......................................17

Fed. R. Civ. P. 12(b)(6)............................................................9

Fed. R. Civ. P. 15(a)(2)..........................................................17

Fed. R. Civ. P. 16(b)(4)..........................................................16

## I. INTRODUCTION:

This case arises from a family dispute over a highly talented high school football player, PHILLIP BELL III ("BELL III"), brought by his father, Plaintiff PHILLIP BELL JR ("BELL JR"), and Plaintiffs LORNA BARNES ("L. BARNES") and ANTHONY BARNES ("A. BARNES"), BELL III's maternal grandparents (collectively "PLAINTIFFS"). PLAINTIFFS have been wrongfully and deliberately excluded from BELL III's life by a network of adults, including officials and employees of SADDLEBACK VALLEY UNIFIED SCHOOL DISTRICT ("SADDLEBACK") and its head football coach, JOHNSON.

This case is not about football—it is about accountability, constitutional rights, and the protection of family integrity. It seeks to prevent school officials and coaches, who have no lawful custody or guardianship authority, from interfering in and dismantling established parental and grandparental relationships.

SADDLEBACK, through its agents and employees—including JOHNSON—knowingly disregarded District policies and state law by allowing BELL III to play for Mission Viejo High School even though he was not living with a parent or legal guardian within the District. This misconduct was not the product of ignorance or administrative error. Rather, it was facilitated by a lack of adequate training and oversight, and it was driven by the District's and JOHNSON's desire to secure competitive athletic success and the reputational and professional benefits that would follow.

The SAC alleges that SADDLEBACK and JOHNSON took deliberate steps to conceal BELL III's true living arrangements from PLAINTIFFS, failed to provide basic information regarding his school attendance, addresses, or athletic participation, and actively interfered with PLAINTIFFS' ability to locate, contact, and protect him. This conduct directly caused

severe emotional distress and irreparably harmed PLAINTIFFS' familial relationship with BELL III.

This case is not about NIL deals, business, or wins on the field—it is about the constitutional right of a family to remain connected and to make decisions for their child without unlawful interference. The actions of SADDLEBACK and JOHNSON were extreme, outrageous, and in reckless disregard of PLAINTIFFS' rights. They prioritized athletic advantage over the well-being and lawful rights of the child and his family, ignoring their own purported policy of "putting the child first."

For these reasons, and as detailed herein, the Motion to Dismiss should be denied.

## II. RELEVANT FACTUAL BACKGROUND

Plaintiffs largely agree with Defendant's statement of relevant facts and restate them as follows:

PHILLIP III was enrolled as a senior at Mission Viejo High School (hereinafter referred to as "MISSION") without the consent of FATHER and is residing at an address that has not been disclosed to FATHER by MISSION. (SAC, at ¶ 44). The maternal grandparents of PHILLIP III, Maria Lorna Barnes and Anthony Barnes (hereinafter referred to as "GRANDPARENTS" OR "PLAINTIFFS" collectively), helped raise PHILLIP III and have a custodial interest. (SAC, at ¶ 11,12). FATHER lived in Folsom, California, and shared 50/50 custody with SAMANTHA, who lived in nearby Sacramento, California. (SAC, at ¶ 31, 33). PHILLIP III lived in Sacramento with SAMANTHA and ISAIAH SANDOVAL (hereinafter referred to as "SANDOVAL" individually or "DEFENDANTS" collectively). SANDOVAL is the former husband of SAMANTHA BARNES. SANDOVAL has no legal custody right to PHILLIP III. (Exhibit A- Custody Agreement). (SAC, at ¶ 18).

While in Sacramento, PHILLIP III's athletic talent began attracting attention from coaches and scouts. (SAC, at ¶ 36). SANDOVAL, a convicted felon, degenerate gambler, drug user, and money-hungry stepfather, brokered a deal and devised a scheme to capitalize on the talents of PHILLIP III. (Exhibit B- Criminal Record). (SAC, at ¶ 37). SANDOVAL brokered a compensated deal with BRISCOE the owner and operator of the nonprofit company, NEXT LEVEL. The deal was done under undue influence, and sent PHILLIP III to play football for Bishop Alemany in Southern California, which has a record of prior incidents involving unlawful sports recruitment practices, in direct violation of California Interscholastic Federation Rules. (Exhibit C- Bishop Alemany Prior Records). (SAC, at ¶ 38, 39, 40).

PLAINTIFFS began to be concerned when PHILLIP III was moved to Los Angeles California, in direct violation of the custody agreement. (SAC, at ¶ 41). After an unsuitable month at Bishop Alemany, SANDOVAL and SAMANTHA moved again and enrolled PHILLIP III at MISSION without FATHER'S knowledge or consent. (SAC, at ¶ 44). PHILLIP III reached out to FATHER in distress stating he did not want to be in Los Angeles and was upset by the domestic violence and drug use between SAMANTHA and SANDOVAL. GRANDPARENTS also would visit SAMANTHA to find that there was no food in the home, alcohol was easily accessible, and there was little to no furniture. (Exhibit D - Police Reports). (SAC, at ¶ 47, 48, 49).

PLAINTIFFS immediately filed a legal action in Superior Court of California, requesting that PHILLIP III be returned to Sacramento to attend his old school, Catholic High School Christian Brothers, in which the Judge ordered SAMANTHA and SANDOVAL to return PHILLIP III to FATHER in Sacramento immediately after his first semester at MISSION. (Exhibit E, County of Sacramento Court Order). (SAC, at ¶ 54).

In his first semester at MISSION, PHILLIP III helped the football team capture a Division I-A State Football Championship and in the state title game, PHILLIP III was recognized as the most valuable player. (SAC, at ¶ 57). SADDLEBACK VALLEY UNIFIED SCHOOL DISTRICT (hereinafter referred to as "DISTRICT" individually or "DEFENDANTS" collectively) is a public school district under the laws of California. DISTRICT, SAMANTHA, and SANDOVAL were aware of the Court Order to have PHILLIP III return to Christian Brothers, but ignored it. (SAC, at ¶ 13, 58). SAMANTHA would then enter PHILLIP III into a contractual relationship with KLUTCH, a Los Angeles-based sports agency. FATHER was not aware of PHILLIP III's contractual relationship with KLUTCH nor did FATHER consent to it. (Exhibit F - KLUTCH Contract). (SAC, at ¶ 61, 62, 63). Approximately nine months after the move to Los Angeles, SAMANTHA died under suspicious circumstances. (SAC, at ¶ 65). On or about June 25th, 2024 SAMANTHA and SANDOVAL were allegedly vacationing in Las Vegas, Nevada. SAMANTHA, a type 1 diabetic, was without her medicine and was supplied cocaine by SANDOVAL. SAMANTHA began vomiting to the point of becoming lethargic. (SAC, at ¶ 66, 67, 68, 69).

Instead of seeking medical assistance, SANDOVAL left SAMANTHA in their hotel room alone for hours and allegedly went out gambling with SAMANTHA's money. (SAC, at ¶ 70, 71). After receiving a phone call that SAMANTHA was found dead, SANDOVAL left Las Vegas almost immediately, taking only SAMANTHA's bank cards, phone, purse, and thousands of dollars in casino chips, leaving all of her other belongings behind. (SAC, at ¶ 72). The next day SANDOVAL went shopping with SAMANTHA'S bank card spending nearly a thousand dollars on items at a Footlocker in Los Angeles. (Exhibit G- Bank Statements). (SAC, at ¶ 73).

PHILLIP III called FATHER in tears over the news of his mother's death, and FATHER immediately flew to Los Angeles for his son. (SAC, at ¶ 74, 75). PHILLIP III provided his FATHER his address but when FATHER arrived at the address SANDOVAL, BRISCOE, and others coerced PHILLIP III not to open the door. (SAC, at ¶ 76). After SAMANTHA's death, PHILLIP III was harbored without parental consent at another high school student's home that was organized with MISSION and DISTRICT. (SAC, at ¶ 80). DISTRICT and MISSION immediately decided to re-enroll PHILLIP III in school for his senior year with SANDOVAL and BRISCOE listed as his guardians, although they knew that it violated DISTRICT's policy because FATHER, the only parent with custody rights, lived over 400 miles away from the DISTRICT. (Exhibit H - SVUSD Residency Verification Form). (SAC, at ¶ 83). DISTRICT and MISSION publicly promoted a GoFundMe page started by SANDOVAL which stated that it would be used for SAMANTHA'S funeral expenses and children although they knew that he did not have custodial rights. (SAC, at ¶ 85). KLUTCH also monetarily supported this GoFundMe, and SANDOVAL did not use any of the funds from the go fund me for SAMANTHA'S funeral, but demanded that GRANDPARENTS pay for all expenses. (Exhibit I- GoFundMe Screenshots); (Exhibit J- Funeral Text Messages). (SAC, at ¶ 86, 87, 88, 89).

DISTRICT and MISSION also allowed PHILLIP III to participate in summer football practice without consent from FATHER. (SAC, at ¶ 92). After learning of this, on July 5, 2024, PLAINTIFF'S sent a cease-and-desist letter to all DEFENDANTS asking them not to have contact with PHILLIP III and to notify them of PHILLIP III's whereabouts. (See Exhibit K- Cease and Desist Letter). (SAC, at ¶ 95). The cease-and-desist was ignored and violated by all DEFENDANTS in direct violation of California law, the court order, and CIF

regulations. (Exhibit L- Football Screenshot). (SAC, at ¶ 99). BRISCOE and NEXT LEVEL also intentionally interfered with the PLAINTIFFS custodial rights by fraudulently adding himself as an emergency contact on official school documentation, claiming to be PHILLIP III's uncle. (SAC, at ¶ 84).

EDWARD WONG (hereinafter referred to as "WONG" individually or "DEFENDANTS" collectively) was the Board President of DISTRICT at all relevant times. TRICIA OSBORNE (hereinafter referred to as "OSBORNE" individually or "DEFENDANTS" collectively) was an agent of DISTRICT and worked at MISSION as the school's principal. CHAD JOHNSON (hereinafter referred to as "JOHNSON" individually or "DEFENDANTS" collectively) was an agent of DISTRICT and worked at MISSION as the Head Football Coach. (SAC, at ¶ 19, 20, 21). MISSION, DISTRICT, OSBORNE, and JOHNSON were all aware of SAMANTHA's death, SANDOVAL's lack of custodial rights, BRISCOE's fraudulent claim of relation to PHILLIP III, but still allowed PHILLIP III to enroll at MISSION for the 2024-2025 school year without parental consent. (Exhibit M- 2024-2025 MISSION Enrollment). (SAC, at ¶ 100). When PLAINTIFFS reached out with concern for their son and grandson, OSBORNE and JOHNSON disclosed that they were aware of PHILLIP III's location but refused to share it. (SAC, at ¶ 105). JOHNSON intentionally interfered with PLAINTIFFS' rights by making promises to PHILLIP III that he would be able to participate in football even if he did not have any consent from PLAINTIFFS. (SAC, at ¶ 107). DISTRICT, WONG, JOHNSON, and OSBORNE also took PHILLIP III and SANDOVAL 2,400 miles across state lines on a trip to Hawaii for a football game without PLAINTIFFS' consent. (Exhibit N- Hawaii Screenshot). (SAC, at ¶ 109). BRISCOE, JOHNSON, and NEXT LEVEL were able to

capitalize off of PHILLIP III due to his isolation from his family, and keep him playing at Mission Viejo.

### III. ARGUMENT

#### A. STANDARDS ON A MOTION TO DISMISS

A Motion to Dismiss should be denied if the subject complaint contains factual allegations adequate to give defendants fair notice of the pending claims and enables them to defend themselves if the complaint's allegations, taken as true, plausibly suggest entitlement to relief. *Starr v. Baca, 652 F.3d 1202, 1216-1217 (9th Cir. 2011), rehearing en banc denied, 659 F.3d 850 (9th Cir. 2011).* When ruling on a dismissal motion, the Court must accept as true all factual allegations in the complaint. *Erickson v. Pardus, 551 U.S. 89, 94 (2007).* The Court must also draw inferences in favor of the plaintiff; the complaint should be construed favorably to the pleader. *Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Walleri v. Federal Home Loan Bank of Seattle, 83 F.3d 1575, 1580 (9th Cir. 1996).* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted).* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id., 556 U.S. at 677-78.*

"A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).* Dismissal for failure to state a claim is proper "only if it is clear that no relief could be granted under any set of facts that could be provided consistent with the allegations." *Hishon v. King &amp;*

*Spalding, 467 U.S. 69, 73 (1984).* The issue is whether the plaintiff is entitled to offer evidence to support the claims, not whether based on a complaint's allegation they will prevail as a matter of law. *Scheuer, supra 416 U.S. at 236 (no quotations added).* Furthermore, the Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000).*

Finally, in the Ninth Circuit, courts have consistently held that motions to amend should be granted freely, especially at the Rule 12(b)(6) stage, to address any deficiencies in the complaint. This liberal standard ensures that plaintiffs have ample opportunity to present their claims adequately. For instance, in *Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884 (9th Cir. 2019), the Ninth Circuit noted that while the district court had dismissed the complaint under Rule 12(b)(6), it had also granted the plaintiff leave to amend, underscoring the principle that leave to amend should be granted freely to allow plaintiffs to address deficiencies in their pleadings.

## IV. ARGUMENT

### A. PLAINTIFFS HAVE STATED A CLAIM FOR THE SECOND CAUSE OF ACTION AGAINST THE DISTRICT

Defendants' reliance on the cases cited is misplaced, as the egregious conduct alleged in the SAC presents a materially different factual scenario than the cases they reference.

1. **Official Policy or Custom**

Defendants cite Oviatt, Estate of Osuna, Segura, and other authorities to argue that PLAINTIFFS' allegations are conclusory and fail to identify a specific policy or custom. Unlike the "sweeping allegations" rejected in Segura and A.B. v. City of Santa Ana, PLAINTIFFS have alleged detailed, specific facts showing that District officials—acting in concert—knowingly and repeatedly engaged in conduct designed to interfere with a parent's custody rights for the benefit of the District's football program.

The SAC alleges that Defendants knew the funds from a GoFundMe campaign would be used to harbor BELL III away from Father (¶98). It further alleges that JOHNSON admittedly knew that BRISCOE and SANDOVAL were "bad guys" but failed to do anything to help reunite BELL III with Father (¶99). Most tellingly, JOHNSON stated during a recorded conversation with Father that if SAMANTHA was related to him, he would have killed SANDOVAL (¶100; Exhibit E, Transcript pg. 27), demonstrating not only knowledge of wrongful conduct but a conscious decision to condone and perpetuate it. Importantly, the SAC also alleges that the vice principal was present during this conversation, knew of JOHNSON's meeting with BELL III on the day his mother died, was aware of JOHNSON's outlandish and threatening statements, and took no action to intervene. Instead, the vice principal's conduct amounted to tacit approval of JOHNSON's actions and statements. Such knowledge and inaction from a high-level administrator is compelling evidence that the District condoned, ratified, and perpetuated this misconduct. This conduct was not isolated or sporadic, as in Estate of Osuna. Rather, as alleged in ¶¶152–153, it reflects an unwritten practice of ignoring District bylaws and "putting the child first" in a manner that prioritized athletic success over legal parental rights—a practice so persistent and widespread that it became the District's de facto policy.

### 2. Failure to Train

Defendants rely on Hyde and Connick to argue that PLAINTIFFS have not shown a pattern of violations or that this is the rare case where the need for training was "patently obvious." However, unlike Hyde, the facts here are so egregious that the risk of constitutional violation was plainly foreseeable without reference to prior incidents. JOHNSON's statements in ¶100—expressing that he would have killed SANDOVAL if related to SAMANTHA—combined with his admitted knowledge in ¶99 that BRISCOE and SANDOVAL were "bad guys" and his refusal to intervene, illustrate a deliberate disregard for basic constitutional rights. The vice principal's corroborating presence, her knowledge of the events, and her choice to support rather than stop JOHNSON's conduct further highlight the complete absence of adequate training to prevent interference in custodial rights.

The SAC further alleges that the District provided no training or guidance to prevent such blatant interference in custodial rights, despite the high-pressure environment of competitive athletics where player recruitment and retention pressures are well-known (¶152). Under Connick, this kind of egregious, foreseeable misconduct is exactly the type of "patently obvious" situation where a single incident can suffice to establish deliberate indifference.

### 3. Final Policymaker's Decision

Defendants cite Pembaur, Praprotnik, Coming Up, Inc., and Jefferson to argue that PLAINTIFFS have not identified a final policymaker. The SAC directly rebuts that argument. As alleged in ¶¶98–100 and Exhibit E, during the conversation between JOHNSON and Father, the vice principal was present, heard the entire exchange—including JOHNSON's

12

admissions and threats—and voiced no disagreement. Instead, the vice principal supported JOHNSON's position.

Under Pembaur, municipal liability attaches when a decisionmaker with final authority makes or ratifies the decision at issue. The vice principal's tacit and express approval of JOHNSON's conduct, combined with the fact that JOHNSON was never disciplined for these serious and egregious comments (¶100), constitutes ratification at a policymaking level. Unlike Praprotnik, where the officials' actions were constrained by superior policies, here there is no evidence of any policy prohibiting the conduct—rather, the District's inaction in the face of clear knowledge demonstrates ratification.

4.  **Conclusion on Monell Claim:**

Even under the cases Defendants rely upon, PLAINTIFFS' allegations meet and exceed the required pleading standard for a Monell claim. The SAC does not merely recite legal elements; it provides specific examples, direct quotes, transcript excerpts, and attached exhibits (¶¶82–85, ¶¶98–100, ¶132, ¶¶152–154, Exhibit E) showing coordinated, intentional conduct by District representatives that deprived PLAINTIFFS of constitutional rights. At the motion to dismiss stage, these detailed and particularized allegations are more than sufficient to plausibly state a claim under all three Monell theories—official policy or custom, failure to train, and final policymaker decision.

**B. PLAINTIFFS HAVE STATED A CLAIM FOR THE EIGHTH CAUSE OF ACTION (UNJUST ENRICHMENT)**

Defendants' assertion that the SAC fails to allege facts showing Defendant JOHNSON personally benefited at PLAINTIFFS' expense is incorrect. The SAC provides concrete,

detailed allegations explaining both the nature of the benefit JOHNSON received and the unethical means by which it was obtained.

### 1. The Benefit Received by JOHNSON

The SAC alleges in ¶132 that "CIF, DISTRICT, WONG, NEXT LEVEL, BRISCOE, SANDOVAL, OSBORNE, and JOHNSON all benefited from the talents, skills, abilities, name, image, and likeness of BELL III at the expense of PLAINTIFFS and told BELL III not to communicate with PLAINTIFFS."

As head coach, JOHNSON's career success is closely tied to wins, championships, and the performance of key players. BELL III's role as MVP of the state championship game and as one of Mission's most outstanding athletes brought JOHNSON heightened prestige, marketability, and standing in the competitive coaching profession. Without BELL III, JOHNSON's chances of achieving that level of recognition would have been significantly diminished.

### 2. Allegations Showing BELL III Was Himself the Benefit

In the SAC, PLAINTIFFS allege at ¶138: "If BELL III was an average student who never played football, DEFENDANTS would have never offered him opportunities to live with millionaires, clothing, housing, fame, fortune, and other resources to persuade BELL III not to have contact with PLAINTIFFS and to stay at MISSION."

At ¶139, PLAINTIFFS further allege: "If BELL III was an ordinary student, DEFENDANTS would not have violated District policies by offering the student such profound benefits." These allegations directly show that BELL III's extraordinary athletic value—not any neutral educational purpose—was the driving force behind DEFENDANTS' actions. The benefit in this case was not merely in the form of publicity or wins; BELL III

himself was the sought-after asset whose presence and performance conferred tangible and intangible gains upon DEFENDANTS.

### 3. Unethical Means of Obtaining the Benefit

The SAC alleges that JOHNSON actively participated in keeping BELL III away from his father:

- ¶82 – Meeting with BRISCOE and SANDOVAL at 256 Moccasin, an address tied to the Mission football program.
- ¶83 – Father traveled to this address immediately after BELL III disclosed it.
- ¶84 – SANDOVAL coerced BELL III not to open the door, following a plan with BRISCOE and JOHNSON.
- ¶85 – BRISCOE, SANDOVAL, and others pressured BELL III to continue avoiding Father.

The vice principal's awareness of these events and support of JOHNSON underscores that this was not an isolated misstep but a coordinated scheme designed to retain BELL III for athletic advantage.

### 4. Pleading Standard Satisfied

PLAINTIFFS have plausibly alleged:

- The benefit (prestige, recognition, career advancement).
- The expense to PLAINTIFFS (loss of parental access and control).
- The unjust circumstances (calculated interference, administrative support).

Moreover, PLAINTIFFS will not know the exact monetary or career-based benefits JOHNSON received until discovery is opened. At this stage, PLAINTIFFS need only allege facts making it plausible that JOHNSON benefited—which they have done. These

15

allegations satisfy the elements of unjust enrichment under California law and meet the federal pleading standard.

### C. PLAINTIFFS HAVE STATED A CLAIM FOR THE TENTH CAUSE OF ACTION

PLAINTIFFS did not exceed the Court's order by including the Tenth Cause of Action. The prior order was silent as to adding new causes of action. The factual basis arose only after PLAINTIFFS obtained a critical recording from Anthony Barnes, previously in his sole possession. This new, material evidence—directly supporting the Tenth Cause—could not have been alleged earlier.

No scheduling order has issued, meaning no amendment deadline exists. Under Rule 16(b)(4), there is no "good cause" requirement until a schedule is set. PLAINTIFFS acted promptly upon discovery of the evidence.

The Tenth Cause of Action is not a tactical afterthought—it is a direct response to newly surfaced facts that materially impact the claims. Denying it now would suppress relevant evidence before discovery has even begun.

### D. PUNITIVE DAMAGES

PLAINTIFFS acknowledge that under California Government Code § 818 and the holding in *Wells v. Bd. of Trustees of California State Univ.*, 393 F. Supp. 2d 990 (N.D. Cal. 2005), punitive damages are not recoverable against a public entity. To that limited extent, PLAINTIFFS do not oppose the dismissal of punitive damages claims against the District itself.

However, this limitation does not apply to individual defendants sued in their individual capacities. The SAC alleges conduct by individual actors—including JOHNSON, BRISCOE, and SANDOVAL—that was malicious, oppressive, and in reckless disregard of

PLAINTIFFS' rights (¶¶98–100, ¶132, ¶¶152–154). As such, PLAINTIFFS maintain that punitive damages remain available against those individuals.

### E. LEAVE TO AMEND

Even if the Court determines that any claim in the SAC is deficient, dismissal without leave to amend would be improper. Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave [to amend] when justice so requires." No scheduling order has been issued; therefore, Rule 16(b)(4)'s "good cause" standard does not yet apply. This case remains at the pleading stage, no prejudice to Defendants has been shown, and PLAINTIFFS have demonstrated diligence in amending promptly when new evidence became available. The SAC contains substantial factual allegations, and any issues the Court identifies could be remedied through targeted amendment. Justice requires that PLAINTIFFS be allowed that opportunity.

### V. CONCLUSION

For the foregoing reasons, PLAINTIFFS respectfully request that the Court deny Defendants' Motion to Dismiss in its entirety. In the alternative, should the Court find any deficiency in PLAINTIFFS' pleadings, PLAINTIFFS request leave to amend to cure such deficiencies.

Respectfully Submitted,

/s/ Jamir Davis
Jamir Davis, Esq.
J. Davis Law Firm, PLLC
328 Scott Street
Covington, KY 41011
(859) 750-5033
jdavis@jdaviscounsel.com
www.jdaviscounsel.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PROOF OF SERVICE**
**Bell, et al. v. Saddleback Valley Unified School District, et al.**
**Case No. 4:24-cv-05545-JST**

I am over the age of 18, and not a party to this action.
On August 12, 2025, I served the following document(s) in this matter:

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' SADDLEBACK VALLEY UNIFIED SCHOOL DISTRICT, EDWARD WONG, TRICIA OSBORNE, CHAD JOHNSON MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

A true and correct copy of the document(s) was served on all parties in this action, addressed as indicated below, by the following means: Email

J. Scott Donald
Spinelli | Donald | Nott
300 University Avenue, Suite 100
Sacramento, CA  95825
Telephone: (916) 448-7888
Fax: (916) 448-6888

Kevin Calia
ILLOVSKY GATES & CALIA LLP
Kevin Calia (State Bar No. 227406)
Eva Schueller (State Bar No. 237886)
kevin@illovskygates.com
eschueller@illovskygates.com
1611 Telegraph Ave., Ste. 806
Oakland, CA 94612
Telephone: (415) 500-6640
*Attorneys for Defendants Steve Briscoe and Next Level Sports & Academics Foundation*

Anthony N. DeMaria
DEMARIA LAW FRIM, A.P.C.
Anthony N. DeMaria (State Bar No. 177894)
ademaria@demarialawfirm.com
1684 W. Shaw Ave., Ste. 101
Fresno, CA 93711
Telephone: (559) 206-2410
*Attorneys for Defendants Saddleback Valley Unified School District, Edward Wong, Tricia Osborne, and Chad Johnson*

2

Bryan M. Sullivan
EARLY SULLIVAN WRIGHT GIZER & MCRAE LLP
Bryan M. Sullivan (State Bar No. 209743)
bsullivan@earlysullivan.com
6420 Wilshire Blvd., 17th Floor
Los Angeles, CA 90048
Telephone: (323) 301-4660
*Attorneys for Klutch Sports Group, LLC*

/**s**/ Kaylah Bozman
Kaylah Bozman